UNITED STATES DISTRICT COURT                    <u>FOR ONLINE PUBLICATION</u>
EASTERN DISTRICT OF NEW YORK

---

SONNIE SAGGIO,

                             Plaintiff,

        - versus -

SELECT PORTFOLIO SERVICING, INC.;
U.S. BANK NATIONAL ASSOCIATION,
AS TRUSTEE, ON BEHALF OF THE
HOLDERS OF THE HOME EQUITY
ASSET TRUST 2006-3 HOME EQUITY
PASS-THROUGH CERTIFICATES,
SERIES 2006-3; and JPMORGAN CHASE
BANK, N.A.,

                          Defendants.

MEMORANDUM
<u>AND ORDER</u>
15-cv-04300 (JG) (RER)

---

A P P E A R A N C E S:

       GOTTLIEB & GORDON LLP
           111 Broadway
           Suite 701
           New York, NY 10006
       By:    Robert C. Gottlieb
              Derrelle M. Janey
           *Attorneys for Plaintiff*

       MCGLINCHEY STAFFORD
           112 West 34th Street
           Suite 1403
           New York, NY 10120
       By:    Brian S. McGrath
              Michelle Ka-Hing Pak
              Richard Pelliccio
           *Attorneys for Defendants*

JOHN GLEESON, United States District Judge:

On July 22, 2015, Plaintiff Sonnie Saggio ("Saggio") filed a complaint (the "Complaint") against defendants Select Portfolio Servicing, Inc. ("SPS"), U.S. Bank National Association ("U.S. Bank"), as trustee for the holders of the Home Equity Asset Trust 2006-3 Home Equity Pass-Through Certificates, Series 2006-3, and JPMorgan Chase Bank, N.A. ("JPMorgan"). Saggio asserts seven causes of action: (1) breach of contract against SPS; (2) breach of implied covenant of good faith and fair dealing against SPS; (3) fraudulent inducement against SPS; (4) conversion against SPS, U.S. Bank, and JPMorgan; (5) negligent misrepresentation against SPS; (6) unjust enrichment against SPS and U.S. Bank; and (7) violations of New York General Business Law § 349 against SPS. SPS and U.S. Bank (the "Defendants") bring this motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted.[1] I heard oral argument on October 23, 2015. For the reasons that follow, I grant in part and deny in part the motion. Specifically, the following claims survive this motion: breach of contract against SPS, breach of implied covenant of good faith and fair dealing against SPS, fraudulent inducement against SPS, conversion against all defendants, and unjust enrichment against SPS and U.S. Bank. The remaining claims are dismissed.

BACKGROUND

Unless otherwise noted, I draw all facts from the Complaint, ECF No. 1, and they are assumed to be true for the purposes of this motion. *See Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009).

---

[1] JPMorgan is not a party to the instant motion to dismiss.

A.    *Parties and Jurisdiction*

Saggio brings her state law claims under this Court's diversity jurisdiction. She is a resident of Queens. Compl. ¶ 5. SPS is a mortgage loan servicer. It is a Utah corporation registered to transact business in New York, but its principal place of business is in Utah. Compl. ¶ 6. U.S. Bank is a national banking association with offices in New York, but its main office is in Cincinnati, Ohio. Compl. ¶ 7. JPMorgan is a national banking association with offices in New York, but its main office is in Columbus, Ohio. Compl. ¶ 8.

This Court has subject matter jurisdiction, as the parties are citizens of different states and Saggio seeks damages in excess of $75,000. *See* 28 U.S.C. § 1332 (a corporation is "deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business"); *Excelsior Funds, Inc. v. JP Morgan Chase Bank, N.A.*, 470 F. Supp. 2d 312, 313 (S.D.N.Y. 2006) ("[A] national bank is a citizen only of the state in which its main office is located, and not the state in which its principal place of business is located, if that state differs from the location of its main office."). A court sitting in diversity applies "federal pleading standards and New York's contract and tort laws." *LBBW Luxemburg S.A. v. Wells Fargo Secs. LLC*, 10 F. Supp. 3d 504, 508 (S.D.N.Y. 2014).

B.    *Factual Background*

In October 2002, Saggio bought a two-family home at 159-18 95th Street in Howard Beach, New York (the "Howard Beach Home" or "Home"), where she lived for twelve years. Compl. ¶ 9. In November 2005 Saggio refinanced the Home, delivering a mortgage secured by it (the "Mortgage"), as well as a note (the "Note"), to certain non-parties. Compl. ¶ 10. In March 2010, the non-parties assigned those instruments to U.S. Bank. Compl. ¶ 12. From that time forward, SPS serviced the Mortgage and Note on behalf of U.S. Bank. Compl.

¶ 13.  On November 29, 2011, a loan modification agreement (the "Loan Modification Agreement") modified the Mortgage and Note to create a single lien of $813,989.01.  Compl. ¶ 15.

On October 29, 2012, Hurricane Sandy ravaged much of New York City.  The Howard Beach property flooded, and Saggio moved out of her home.  Compl. ¶ 16.

1.    *The Agreement Regarding Principal Owed on the Mortgage and Note*

Sandy's damage decreased the value of the Home and placed Saggio in financial distress.  Compl. ¶ 18.  She had previously made timely payments pursuant to the Loan Modification Agreement, but after Sandy she failed to do so.  Compl. ¶¶ 15, 18.  In the summer of 2013 Saggio, through a representative, Jessica Gamboa, reached out to SPS to talk about the options available to her to save her home, including whether she could renegotiate the principal she owed under the Mortgage and Note.  Compl. ¶¶ 19, 20.  These conversations, which focused primarily on negotiating a one-time, lump sum payment that would satisfy the Mortgage and Note, continued for approximately fifteen months.  Compl. ¶¶ 20-22, 32-34.

On November 19, 2014, Gamboa emailed SPS an offer to pay SPS a lump sum of $250,000 in exchange for satisfaction of the Mortgage and Note.  Compl. ¶ 32.  SPS sent Saggio a letter dated December 9, 2014 agreeing to Saggio's proposed reduction of the remaining mortgage principal to $250,000, but making the agreement contingent upon a number of additional terms.  *See* Compl. ¶ 34-35.  One of these terms was the following:

> "In consideration for SPS's agreement to accept the Short Payoff [*i.e.*, the $250,000], in no event shall you receive any funds from the Short Payoff (unless otherwise approved in advance by SPS). Any surplus funds above the agreed upon net proceeds at the time of closing are the exclusive property of SPS and you agree that any such funds will be remitted to SPS, made payable to Select Portfolio Servicing, Inc.  You agree to waive your rights to any escrowed funds or refunds from expenses.  You also agree that any

> proceeds from pending hazard insurance claims will be sent to, and
> retained by, SPS as additional recovery toward the Short Payoff
> loss.  If SPS receives/retains proceeds in excess of the amount that,
> combined with the net proceeds, would have satisfied the lien in
> full, such surplus funds will be returned to you."

Compl. ¶ 35.

On December 10, 2014, Gamboa spoke with an SPS representative named Robin, who told Gamboa that SPS "would accept a lump sum of $250,000.00 in full satisfaction of the Mortgage and Note."  Compl. ¶ 34.  On January 20, 2015, Saggio wired $250,000 to SPS, who, on February 18, 2015, filed a Satisfaction of Mortgage with the Queens County Clerk's Office. Compl. ¶¶ 37-38.

2.    *The Agreement Regarding the FEMA Proceeds*

Before reaching out to SPS to renegotiate the principal on the Mortgage and Note, Saggio submitted a claim to the National Flood Insurance Program ("NFIP"), administered by the Federal Emergency Management Agency ("FEMA"), for the damage inflicted on the Howard Beach Home.  Compl. ¶ 17.  FEMA evaluated and approved Saggio's claim and, on January 16, 2013, issued and mailed Saggio a check (the "January 2013 check")—jointly payable to "Sonnie Saggio & Select Portfolio Servicing Inc."—for $83,386.25 (the "FEMA Proceeds").  *Id*.  Saggio never deposited the January 2013 check.  *Id*.

In late June or early July 2014, almost a year after Saggio had begun talking with SPS about renegotiating the principal owed under the Mortgage and Note, Saggio requested a replacement check from FEMA because she believed the January 2013 Check "had expired and was no longer valid."  Compl. ¶ 24.  FEMA issued her a check dated July 9, 2014 (the "July 2014 Check").  *Id*.  As before, the check was jointly payable to "Sonnie Saggio & Select

Portfolio Servicing Inc.," and was mailed to Saggio. *Id.* Also as before, Saggio never deposited or cashed the July 2014 Check. *Id.*

Saggio alleges that about one month later, SPS requested a check from FEMA representing the FEMA Proceeds and that FEMA issued and sent SPS a check dated August 14, 2014 (the "August 2014 Check"). Compl. ¶ 25. As with the January 2013 Check and the July 2014 Check, the August 2014 Check was jointly payable to "Sonnie Saggio & Select Portfolio Servicing, Inc." *Id.* SPS deposited the joint August 2014 Check without Saggio's endorsement into an SPS account held at JPMorgan, and "some or all of the proceeds of the August 2014 Check were transferred to U.S. Bank." Compl. ¶¶ 27-30.

SPS, in its talks with Saggio about a reduction in the principal owed on the Mortgage and Note repeatedly told Saggio—both before and after SPS received and deposited the August 2014 Check—that "any negotiated terms of the Mortgage and Note would not include the FEMA Proceeds and that Ms. Saggio would retain the FEMA Proceeds." Compl. ¶ 23. Specifically, Saggio alleges that Gamboa communicated with SPS or an SPS representative about the FEMA Proceeds on the following dates:

- On August 5, 2013, Gamboa spoke with Shakira Ford, an SPS representative. Compl. ¶ 20. Among other items concerning the renegotiation of principal, Ford told Gamboa that in any successful renegotiation, Saggio would "retain the FEMA Proceeds." Compl. ¶ 21.

- On some date between December 9, 2014 and January 20, 2015, Gamboa spoke with an SPS representative to clarify the meaning of the above-quoted language in the December 2014 Letter. Compl. ¶ 36. Saggio had been concerned that this language would "be interpreted to apply to the FEMA Proceeds." *Id.* The SPS representative told Gamboa that the language did not apply to the FEMA Proceeds, that nothing in the December 2014 Letter affected the FEMA Proceeds, that Saggio would retain the FEMA Proceeds, and that the $250,000 constituted the entirety of Saggio's obligations to satisfy the Mortgage and Note. *Id.*

Saggio relied on SPS's representations that she could keep the FEMA Proceeds in deciding to make the ultimate payment of $250,000 to SPS. Compl. ¶ 37.

Sometime "[a]fter having fully satisfied the Mortgage," Saggio requested another replacement check from FEMA representing the FEMA Proceeds. Compl. ¶ 39. FEMA told Saggio that SPS had already requested, received, deposited, and cashed a check representing the FEMA Proceeds. *Id*.

After learning that SPS had already cashed the FEMA Proceeds, on April 8, 2015, Gamboa and Saggio called SPS and spoke with Casey Smith. Compl. ¶ 42. Smith told Gamboa that the above-quoted provision in the December 2014 Letter governed the FEMA Proceeds and that SPS would not release the FEMA Proceeds to Saggio. Compl. ¶¶ 42, 44.

## DISCUSSION

A.    *Governing Law*

A motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6) tests whether a claimant's pleading has "give[n] the defendant fair notice of what the claim is and the grounds upon which it rests" such that the claimant is entitled to offer evidence to support the claims. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). At the motion to dismiss stage, a court accepts the complaint's factual allegations as true, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and draws all reasonable inferences in favor of the plaintiff. *Bolt Elec., Inc. v. City of New York*, 53 F.3d 465, 469 (2d Cir. 1995). But "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

In deciding the motion, I may consider the complaint, materials incorporated into the complaint by reference, and documents that are integral to the complaint, *i.e.*, materials whose terms and effect the complaint "relies heavily upon." *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995); *accord Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004).

B.      *Analysis*

     1.      *The Breach of Contract Claim against SPS*

Saggio alleges that SPS breached its contract with her by refusing to remit the FEMA Proceeds to her. The Defendants argue that Saggio has failed to plausibly allege a claim for breach of contract. I disagree.

The elements of a cause of action for breach of contract in New York are: (1) existence of an agreement; (2) performance by the plaintiff; (3) breach of contract by the defendant; and (4) resulting damage. *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.*, 375 F.3d 168, 177 (2d Cir. 2004). Regarding the first element, the New York Court of Appeals has explained that the existence of an agreement stems from "a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Express Indus. And Terminal Corp. v. N.Y. State Dept. of Transp.*, 93 N.Y.2d 584, 589 (1999). Where a written instrument is involved, the parol evidence rule disallows the use of extrinsic evidence, such as oral representations, to contradict the written instrument. *See Sabo v. Delman*, 3 N.Y.2d 155, 161 (1957). But when "a writing is not integrated, parol evidence of additional contract terms may be admitted to complete the agreement, so long as the additional terms do not contradict the written terms." *Fierro v. Gallucci*, No. 06-CV-5189 (JFB)(WDW), 2008 WL 2039545, at *6 (E.D.N.Y. May 12, 2008).

SPS argues that the breach of contract claim must be dismissed because the December 2014 Letter constitutes the entirety of the parties' agreement, and that the provision assigning all "pending hazard insurance claims" to SPS "directly contradict[s]" Saggio's claim that she was entitled to the FEMA Proceeds. Def.'s Br., ECF No. 29, at 7. For her part, Saggio contends that SPS did not breach the December 2014 Letter, but instead breached a separate "oral contract" whereby Saggio would retain the FEMA Proceeds regardless of the December 2014 Letter. Compl. ¶ 48.

At this stage, it is unclear whether the language in the December 2014 Letter referring to "pending hazard insurance proceeds" applied to the FEMA Proceeds. Saggio alleges that, by the date of the December 2014 Letter, FEMA had already reviewed her insurance claim and had issued the parties three separate checks for $83,386.25, and that SPS had already deposited one of these checks. Compl. ¶¶ 17, 24-25, 31. A the very least, there is ambiguity with respect to whether the FEMA Proceeds can be considered the proceeds of claims that were "pending" as of December 2014. For that reason, I cannot agree with SPS that the breach of contract claim is "directly contradicted" by the December 2014 Letter.

Thus, I may consider Saggio's allegations that SPS orally assured her on multiple occasions that her right to the FEMA Proceeds remained unaffected by the renegotiation of her principal documented in the December 2014 Letter. Saggio has alleged an oral agreement and a breach of that agreement by SPS's failure to return the FEMA Proceeds.[2] Accordingly, I deny SPS's motion to dismiss the breach of contract claim.

---

[2]    SPS also argues that the Mortgage states that hazard insurance proceeds are to be used "to repair or to restore the damaged Property unless . . . Lender and I have agreed *in writing* not to use the Insurance Proceeds for that purpose," and that this provision lends support to their claim that the December 2014 Letter constituted the entirety of their agreement. Def.'s Br. at 7. As discussed, however, the December 2014 Letter addresses only "pending hazard insurance proceeds," and thus does not clearly govern other types of insurance proceeds. Additionally, the Complaint alleges that Saggio intends to use the FEMA Proceeds to "improve and repair [the Howard Beach Home], which remains in disrepair." Compl. ¶ 48.

2.      *The Breach of Implied Covenant of Good Faith Claim Against SPS*

In New York, every contract contains an implied covenant of good faith and fair dealing. *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004). This duty stands upon the principle that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Kirke La Shelle Co. v. Armstrong Co.*, 263 N.Y. 79, 87 (1933). To succeed on this claim, a plaintiff must allege that "a party to a contract act[ed] in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement." *Aventine Inv. Mgmt., Inc. v. Can. Imperial Bank of Commerce*, 697 N.Y.S.2d 128 (App. Div. 1999).

SPS and U.S. Bank argue that Saggio's claim for breach of the covenant of good faith and fair dealing may not arise from the same facts as a breach of contract claim, and must be dismissed as duplicative. Def.'s Br. at 7. Generally, "New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Harris v. Provident Life and Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002). However, a claim for breach of the implied covenant of good faith and fair dealing may be brought in the alternative to a claim for breach of contract "'where there is a dispute over the existence, scope, or enforceability of the putative contract.'" *Fantozzi v. Axsys Techs., Inc.*, No. 07 Civ. 02667(LMM), 2008 WL 4866054, at *7 (S.D.N.Y. Nov. 6, 2008) (quoting *Reilly v. Natwest Mkts. Group, Inc.*, 181 F.3d 253, 263 (2d Cir. 1999).

I agree with the Defendants that this claim and the breach of contract claim addressed above likely coalesce; both depend on Saggio's factual claim that she was promised

that she could keep the FEMA Proceeds.  However, at this early stage, it suffices to observe that there is "a dispute over the existence [or] scope" of the December 2014 Letter as applied to the ownership of the FEMA Proceeds, *see Fantozzi*, 2008 WL 4866054, at *7, and, drawing all inferences in Saggio's favor, she has sufficiently alleged that SPS and U.S. Bank have breached the implied covenant of good faith and fair dealing by keeping the FEMA Proceeds.  I therefore deny the Defendants' motion to dismiss the claim for breach of implied covenant of good faith and fair dealing.

3.    *The Fraudulent Inducement Claim Against SPS*

To state a claim for fraudulent inducement of a contract under New York law, "the party must allege: (i) a material misrepresentation of a presently existing or past fact; (ii) an intent to deceive; (iii) reasonable reliance on the misrepresentation by appellants; and (iv) resulting damages." *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 143 (2d Cir. 2011).

SPS argues that I should disregard any oral conversations that may form the basis for a fraudulent inducement claim that occurred prior to the December 2014 Letter because "[t]he clear December Letter Agreement . . . forms the basis of Plaintiff's fraud claim . . . [and] the fraudulent statements/conduct would necessarily have to have occurred *between* the time Saggio received the December Letter Agreement and when she made the lump sum payment." Def.'s Reply Br., ECF No. 33, at 5.  I disagree.  The December 2014 Letter stated that the Mortgage would be satisfied by a one-time payment to SPS for $250,000.  Compl. ¶¶ 34, 36. Separately, both in the negotiations leading up to the December 2014 Letter and in representations made after this issuance, SPS promised Saggio that any payment made to reduce her principal on the Mortgage would not affect her right to the FEMA Proceeds.  Compl. ¶¶ 23, 36.  The core of Saggio's claim is that defendants made intentional misrepresentations about who

would keep the FEMA Proceeds in order to induce Saggio to enter into an agreement for a one-time, $250,000 payment, and that she relied on those misrepresentations throughout the negotiations. Saggio's claim of fraudulent inducement is supported by her allegation that, at the same time SPS was assuring her that her right to the FEMA Proceeds remained unchanged, SPS obtained and deposited—without Saggio's endorsement—the August 2014 Check. Compl. ¶ 55.

The oral statements SPS allegedly made to Saggio about the FEMA Proceeds are misrepresentations of fact collateral to the contract that may have induced the plaintiff to sign the contract. They therefore allege a separate breach of duty. *See Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 184 (2d Cir. 2007). Because the Complaint alleges that SPS kept the FEMA Proceeds for itself, in direct contravention to what Saggio was simultaneously hearing from its representatives, Saggio has stated a claim for fraudulent inducement under New York law.

SPS also argues that Saggio failed to meet Rule 9(b)'s heightened pleading standard. In a claim for fraud, Fed. R. Civ. P. 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake." Accordingly, a plaintiff must "allege specific facts as to the fraud, including the misleading statements, speaker, time, place, individuals involved, and specific conduct at issue." *Johnson*, 660 F.3d at 143. "Rule 9(b) is designed to further three goals: (1) providing a defendant fair notice of plaintiff's claim, to enable preparation of defense; (2) protecting a defendant from harm to his reputation or goodwill; and (3) reducing the number of strike suits." *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987).

Saggio has satisfied her obligations under Rule 9(b) by alleging that: (1) after SPS "obtained and deposited the August 2014 Check without Ms. Saggio's permission or knowledge,

discussions regarding renegotiation of the principal owed under the Mortgage and Note continued," Compl. ¶ 31; (2) on December 10, 2014, an SPS representative by the name of Robin informed Plaintiff that "SPS would accept a lump sum of $250,000.00 in full satisfaction of the Mortgage and Note," without informing Saggio of SPS's possession of the FEMA Proceeds, Compl. ¶ 34; and (3) between December 9, 2014 and January 20, 2015, Plaintiff "spoke with a representative from SPS . . . [who] explicitly informed Ms. Gamboa that [language in the December 2014 Letter] did not apply to the FEMA Proceeds," and did not inform Saggio of SPS's possession of the FEMA Proceeds, Compl. ¶ 36. Plaintiff has thus alleged at least one conversation that she had on a specific date with a named SPS representative after SPS allegedly deposited the August 2014 Check without Saggio's endorsement.

Drawing all inferences in Plaintiff's favor, Saggio has "provide[d] an adequate basis for [her] allegations and [has] give[n] defendants enough information to put them on notice of the nature of the claim." *City of New York v. Joseph L. Balkan, Inc.*, 656 F. Supp. 536, 545 (E.D.N.Y. 1987). I therefore deny the Defendants' motion to dismiss the fraudulent inducement claim.

4.      *The Conversion Claim Against SPS and U.S. Bank*

"Conversion occurs when a defendant exercises unauthorized dominion over personal property in interference with a plaintiff's legal title or superior right of possession." *LoPresti v. Terwilliger*, 126 F.3d 34, 41 (2d Cir. 1997) (internal quotation marks omitted). To sustain a claim for conversion, Saggio must show: "(1) the property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession or control over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the thing in

question, to the alteration of its condition or to the exclusion of the plaintiff's rights." *Moses v. Martin*, 360 F. Supp. 2d 533, 541 (S.D.N.Y. 2004) (internal quotation marks omitted).

U.S. Bank and SPS argue that Saggio's cause of action for conversion fails because it is redundant to her breach of contract claim. Def.'s Br. at 9. Defendants also argue that Saggio did not "control, own[] or possess[]" the FEMA Proceeds as required under New York law because, pursuant to the December 2014 Letter, Saggio had assigned her rights to the FEMA Proceeds to SPS. *Id.* Saggio argues that she had ownership interest in the August 2014 Check as a joint payee to the check, Compl. ¶¶ 65, 69, and that she had possession of the FEMA Proceeds via the January 2013 Check and July 2014 Check. Pl.'s Br., ECF No. 31, at 16.[3]

As discussed previously, I find that the December 2014 Letter relied upon by SPS and U.S. Bank does not unambiguously assign the rights to the FEMA Proceeds to SPS. Thus, the motion to dismiss the conversion claim cannot be decided on that ground.

Setting the December 2014 Letter aside, the Complaint alleges that the August 2014 Check was "made payable jointly to both Ms. Saggio and SPS," but that by mid-April 2015, SPS had deposited and cashed the August 2014 Check without Saggio's endorsement, and had refused to return the FEMA Proceeds to Saggio. Compl. ¶¶ 28, 42-44. Saggio, as a payee of the August 2014 Check, and absent any other clear arrangement between the parties, had an interest in the check and has met the ownership element to state a claim for conversion. *See Capital Dist. Tel. Emp. Fed. Credit Union v. Berthiaume*, 432 N.Y.S.2d 435, 439 (Sup. Ct. 1980)

---

[3]    There is a typographical error in the claim for conversion in the Complaint. Specifically, the reference in the Complaint to a "December 2014 Check" refers to the August 2014 Check obtained and deposited by SPS. *See* Pl.'s Br. at 16 n.9.

(finding that a named payee on a check may recover against a party who acquired proceeds from the check after the check was deposited with a missing endorsement).[4]

Saggio has also met the third element required to state a claim for conversion, because she has alleged that "SPS has consistently refused to return the FEMA Proceeds despite demands made by Ms. Saggio and her agents."  Compl. ¶ 71; *see also, e.g., Schwartz v. Capital Liquidators, Inc.*, 984 F.2d 53, 54 (2d Cir. 1993) ("Where the original possession is lawful, a conversion does not occur until the defendant refuses to return the property after demand or until he sooner disposes of the property." (quoting *Johnson v. Gumer*, 464 N.Y.S.2d 318, 319 (App. Div. 1983)).

Finally, although Defendants are correct that a claim for conversion cannot be "validly maintained where damages are merely being sought for breach of contract," *see Peters Griffin Woodward, Inc. v. WCSC, Inc.*, 452 N.Y.S.2d 599, 600 (App. Div. 1982), Saggio is not only alleging a violation of a contract, but also that SPS cashed a check—ungoverned by the provisions of the December 2014 Letter—that was jointly payable to herself and SPS, without obtaining her endorsement.  Accordingly, Saggio has properly pleaded a conversion claim as an alternative claim to breach of contract, and the motion to dismiss the claim for conversion is denied.  *See, e.g.*, *Command Cinema Corp. v. VCA Labs, Inc.*, 464 F. Supp. 2d 191, 199 (S.D.N.Y. 2006) ("[A] plaintiff must show acts that were unlawful or wrongful as opposed to violations of contractual rights.").

---

[4]        That Saggio did not have actual possession of the August 2014 Check is immaterial.  *See Lund's Inc. v. Chemical Bank*, 870 F.2d 840, 853 ("New York law does not require delivery as a prerequisite to a conversion action . . . .").

5.      *The Negligent Misrepresentation Claim against SPS*

"To state a claim for negligent misrepresentation under New York law, a plaintiff must allege that (1) the parties stood in some special relationship imposing a duty of care on the defendant to render accurate information, (2) the defendant negligently provided incorrect information, and (3) the plaintiff reasonably relied upon the information given." *Saltz v. First Frontier, LP*, 782 F. Supp. 2d 61, 82 (S.D.N.Y. 2010). This "special relationship" requirement stems from the idea that liability should attach only to those in a "position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified." *Kimmell v. Schaefer*, 89 N.Y.2d 257, 263 (1996). To determine whether that "special relationship" exists, a court considers the following elements: "whether the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." *Id.* at 264.

SPS argues that Saggio failed to allege any "special relationship" between her and SPS. Def.'s Br. at 10. Saggio responds that she and SPS had an "extensive, on-going relationship of over fifteen months" regarding the renegotiation of the Mortgage and Note, and that SPS had superior knowledge both "of the fact that it had secretly obtained and deposited the FEMA Proceeds… [and] that it considered the December 2014 Letter to affect Ms. Saggio's ownership of the FEMA Proceeds." Pl.'s Br. at 12, 14. For the following reasons, I conclude that Saggio has failed to adequately allege a special relationship that would impose a duty of care on SPS to provide accurate information for purposes of a negligent representation claim.

First, simply because SPS and Saggio negotiated a reduction of the principal

Saggio owed under the Mortgage does not create—without more—a special relationship. "As

New York courts routinely explain, there is no fiduciary duty . . . arising out of the contractual

arms-length debtor and creditor legal relationship between a borrower and a bank which would

give rise to a cause of action for negligent misrepresentation." *Village On Canon v. Bankers Tr.*

*Co.*, 920 F. Supp. 520, 531-32 (S.D.N.Y. 1996) (dismissing a claim for negligent

misrepresentation between parties bound by a contractual arrangement and loan and guaranty

documents) (internal quotation marks omitted); *see also, e.g.*, *Grimes v. Fremont Gen. Corp.*,

933 F. Supp. 2d 584, 608 (S.D.N.Y. 2013) ("A standard lender-borrower relationship is not the

kind of special relationship that supports a claim of negligent misrepresentation.") (quoting

*Boniel v. U.S. Bank N.A.*, No. 12-CV-3809 (ERK)(MDG), 2013 WL 458298, at *4 (E.D.N.Y.

Feb. 6, 2013)); *Banque Arabe et International D'Investissement v. Md. Nat'l Bank*, 57 F.3d 146,

158 (2d Cir. 1995) (upholding the district court's dismissal of a negligent misrepresentation

claim after finding that a banking relationship and a relationship governed by a loan participation

agreement did not necessarily create a "special relationship").

Saggio points to three cases in support of her argument that her relationship with

SPS goes beyond that of an ordinary borrower-lender. In each of these three cases, though, the

deciding court found that the defendants took additional action beyond that of a typical

borrower-lender that justified a finding of a special relationship. None of those circumstances

are present here.

In *Picini v. Chase Home Finance LLC*, 854 F. Supp. 2d 266, 277 (E.D.N.Y.

2012), the Court, among other factors, relied on the defendant mortgagee having assigned the

plaintiff mortgagor a specific manager to assist with the loan application process in determining

that a "special relationship" existed. The plaintiff alleged that she had received conflicting information on multiple occasions from this manager and other of the defendant's representatives, and the Court found that the defendant's representatives had given plaintiffs "the runaround." *Id.* at 271. Similarly, in *Fleet Bank v. Pine Knoll Corp.*, 736 N.Y.S.2d 737, 741-42 (App. Div. 2002), in finding a special relationship, the Court relied on the defendant's appointment of "relationship managers" to the plaintiff, as well as an admission from one of the defendant bank's senior vice presidents that "a lot of small business customers are not financiers . . . [t]hey rely heavily upon their relationship managers . . . . We need to be very careful in how we advise these people." Assuming without deciding that the appointment of a relationship manager is one that elevates an ordinary borrower-lender relationship to a "special relationship," *cf. Harte v. Ocwen Financial Corp.*, No. 13-CV-5410 (MKB), 2014 WL 4677120, at *15 (E.D.N.Y. Sept. 19, 2014) ("[T]he provision of [a relationship manager] does not strike the Court as an act beyond that involved in an ordinary borrower-lender relationship.") (collecting cases), SPS did not assign any manager to Saggio, and thus these cases are distinguishable.

In the third case Saggio relies on, *Smith v. Ameriquest Mortg. Co.*, 876 N.Y.S.2d 447, 450 (App. Div. 2009), the finding of a special relationship relied on plaintiff's allegations that the defendant's representative twice personally came to the plaintiff's home to persuade her of the benefits of refinancing her home's mortgage. Here, Saggio does not claim that an SPS representative ever came to her home to solicit her business, and indeed Saggio herself was the one who initiated the negotiations for a reduction in the principal she owed under the Mortgage and Note. Compl. ¶¶ 19-20. Although the Complaint alleges that SPS responded to Saggio's advances, Compl. ¶¶ 22-23, it does not claim that SPS acted in a manner that might give rise to a fiduciary, rather than contractual, duty.

Saggio's second argument is that SPS had superior knowledge about the FEMA Proceeds. But Saggio had the same access to information about the FEMA Proceeds that SPS did. Saggio twice requested and twice received checks from FEMA without cashing them. Compl. ¶¶ 17, 24. When she contacted FEMA a third time to request another replacement check, FEMA readily informed Saggio that SPS had already requested, deposited, and cashed the same check. Compl. ¶ 39.

In sum, Saggio has not alleged facts establishing a relationship with SPS beyond that of borrower-lender, and thus has failed to allege any special relationship between herself and SPS. Accordingly, I grant SPS's motion to dismiss the claim for negligent misrepresentation.

6.    *The Unjust Enrichment Claim Against SPS and U.S. Bank*

A claim of unjust enrichment under New York law is quasi-contractual; it "contemplates 'an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties.'" *Georgia Malone & Co., Inc. v. Rieder*, 19 N.Y.3d 511, 516 (2012) (quoting *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 142 (2009)). To state a claim for unjust enrichment under New York law, Saggio must plead that "(1) defendant was enriched; (2) the enrichment was at plaintiff's expense; and (3) the circumstances were such that equity and good conscience require defendant to make restitution." *Hughes v. Ester C Co.*, 930 F. Supp. 2d 439, 471 (E.D.N.Y. 2013) (internal quotation marks omitted). Proof of an enforceable contract generally precludes recovery under a theory of unjust enrichment, *see Goldman v. Metro. Life Ins. Co.*, 5 N.Y.3d 561, 572 (2005), but where a contract's existence or enforceability is in dispute, a claim of unjust enrichment may be plead in the alternate to breach of contract. *See, e.g.,* Fed. R. Civ. P. 8(d); *Labajo v. Best Buy Stores, L.P.*, 478 F. Supp. 2d 523, 531 (S.D.N.Y.2007) ("When there is a bona fide dispute as to the

existence of a contract, a party may proceed upon a theory of unjust enrichment, and an unjust enrichment claim may be alleged alongside a breach of contract claim.").

Defendants argue that the December 2014 Letter, because it addresses "pending hazard insurance proceeds," is a full, written expression of the parties' agreement concerning the FEMA Proceeds, and thus bars assertion of an unjust enrichment claim. Def.'s Br. at 10-11. As discussed above, I conclude that the December 2014 Letter does not clearly entitle SPS to the FEMA Proceeds at issue. Saggio's unjust enrichment claim is based on allegations that SPS and U.S. Bank denied her the FEMA Proceeds to their own enrichment, and that such conduct occurred outside the bounds of the December 2014 Letter. Because the parties disagree on the existence and scope of a contract governing the FEMA Proceeds, it would be premature to dismiss Saggio's unjust enrichment claim. *See, e.g., Labajo*, 478 F. Supp. 2d at 531.

Thus, even though Saggio cannot ultimately prevail on both her breach of contract and her unjust enrichment claims, at this stage, I deny Defendants' motion to dismiss.

7.      *The Motion to Dismiss the § 349 Claim against SPS*

Section 349 of the New York General Business Law prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. Law § 349(a). Anyone injured by a violation of this section may bring a private cause of action. *Id.* § 349(h). To establish a prima facie case under § 349, a plaintiff must show: (1) the defendant directed his deceptive acts at consumers; (2) the defendant's acts misled the plaintiff in a material way; and (3) resulting injury. *See Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009).

SPS challenges the Complaint's sufficiency as to the first two elements of § 349. Def.'s Br. at 12. I agree that the Complaint does not allege consumer-oriented conduct, and for the reasons explained below, dismiss Saggio's claim under § 349.

"The paradigm § 349 case 'involves an individual consumer who falls victim to misrepresentations made by a seller of consumer goods[,] usually by way of false and misleading advertising.'" *Spirit Locker, Inc. v. EVO Direct, LLC*, 696 F. Supp. 2d 296, 301 (E.D.N.Y. 2010) (quoting *Teller v. Bill Hayes, Ltd.*, 630 N.Y.S.2d 769, 774 (App. Div. 1995)). The rationale behind the application of the statute is to prevent "wrongs against the consuming public" and "'halt[] consumer frauds at their incipiency without the necessity to wait for the development of persistent frauds[.]'" *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank N.A.*, 85 N.Y.2d 20, 24-25 (1995) (quoting Mem. of Governor Rockefeller, 1970 NY Legis. Ann., at 472-73). Thus, courts routinely find that private, unique transactions are not subject to liability under the statute. *See, e.g.*, *Oswego*, 85 N.Y.2d at 25 ("Private contract disputes, unique to the parties . . . would not fall within the ambit of the statute."); *Genesco Entm't v. Koch*, 593 F. Supp. 743, 752 (S.D.N.Y. 1984) ("single shot transaction[s]" are not contemplated by the consumer protection provisions).

For example, in *New York Univ. v. Cont'l Ins. Co.*, 639 N.Y.S.2d 283, 290 (1995), the New York Court of Appeals held that a plaintiff failed to allege consumer-oriented conduct in an insurance coverage dispute because, among other reasons, the policy at issue "was not a standard policy . . . [and] was tailored to meet the purchaser's wishes and requirements." In short, it was not the type of dispute that would apply to or affect the general public.

The same is true here. Saggio's claims are based on a unique set of facts, and are precisely the type of "single-shot transaction" that courts find outside the purview of § 349. *See,*

*e.g.*, *New York Univ.*, 87 N.Y.2d at 291 ("[The disagreement at issue] is essentially a 'private' contract dispute over policy coverage and the processing of a claim which is unique to these parties, not conduct which affects the consuming public at large.").  The Complaint alleges that "[a]ll of SPS's actions, omissions, misrepresentations and concealments of material fact were consumer-oriented in nature and had a broader impact on the public by causing damages to consumers at large, including other mortgagors."  Compl. ¶ 84.  But it does not state how any of the alleged misrepresentations would affect—or even ever be heard by—other mortgagors or customers.  Though the offending conduct "need not be repetitive or recurring," it must at least "have a broad impact on consumers at large."  *New York Univ.*, 87 N.Y.2d at 290.  It is unclear to me how a privately-negotiated agreement for a loan reduction, or oral statements made regarding a specific check, could have "a broader impact on consumers at large."  *See Oswego*, 85 N.Y.2d at 25.  The mere fact that "[l]ike many homeowners at the time, Ms. Saggio was a homeowner in financial distress," Compl. ¶ 2, does not convert the unique set of facts alleged here into one that applies to homeowner-consumers at large.

Because Saggio's claim fails to allege any facts that would meet the threshold requirement of consumer orientation, I need not address the other elements for stating a claim under § 349.  I grant SPS's motion to dismiss the § 349 claim.

CONCLUSION

For the foregoing reasons, I grant in part and deny in part the motion to dismiss. The following claims survive this motion: breach of contract against SPS, breach of implied covenant of good faith and fair dealing against SPS, fraudulent inducement against SPS, conversion against all defendants, and unjust enrichment against SPS and U.S. Bank.  The remaining claims are dismissed.

So ordered.

John Gleeson, U.S.D.J.

Dated: November 5, 2015
        Brooklyn, New York